

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00471-CR

———————————————————

TERRENCE COLEMAN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. F18-2347-158

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel
Justice Kerr concurs without opinion.

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury found Appellant Terrence Coleman guilty of burglary of a habitation with the intent to commit sexual assault and assessed his punishment at ninety-nine years' confinement. *See* Tex. Penal Code Ann. §§ 12.42(c), 30.02. He raises two issues on appeal.

First, Coleman argues that the trial court erred by denying his requests for a mistrial due to the admission of extraneous-offense evidence and his inability to properly prepare for trial. We conclude that the trial court did not err by denying his motions for mistrial. As to the admission of extraneous-offense evidence, Coleman waived error, if any, by not objecting each time the State referred to the evidence during its opening statement, by being the first party to offer such evidence at trial, and then by not objecting to such evidence when the State introduced it at other points during the trial. The trial court also did not abuse its discretion by admitting the evidence because it was relevant to rebut Coleman's defense of consent and to explain how Coleman had become a suspect in the burglary, and the evidence was not substantially outweighed by unfair prejudice.

The trial court also did not err by denying Coleman's motions for mistrial regarding an inability to prepare for trial when he based these motions on the trial court's prior denial of his multiple oral motions for continuance. Because it was

within the trial court's discretion to deny an oral motion for continuance, the trial court did not err by denying Coleman's subsequent oral motions for mistrial.

Second, Coleman argues that the trial court erred by denying his requested new trial because the punishment assessed violates both the United States and Texas Constitutions as being excessive, cruel, and unusual. After conducting a threshold inquiry as to whether there is an inference that the punishment assessed is grossly disproportionate to the crime, we conclude that there is no such inference in this case.

Accordingly, we affirm.

## II. BACKGROUND[1]

### A.    The State initially charged Coleman with three offenses that had occurred in Denton County on April 15, 2016.

The State charged Coleman with having committed, on or about April 15, 2016, burglary of a habitation with the intent to commit sexual assault, credit-card abuse against an elderly person, and fraudulent use or possession of identifying information against an elderly person.[2]

---

[1]Coleman does not challenge the sufficiency of the evidence underlying his conviction. Therefore, we outline only those facts necessary to give his complaints context. Our discussion of Coleman's issues will set forth any additional facts relevant to his arguments.

[2]For simplicity, we refer to the charges of credit-card abuse against an elderly person and fraudulent use or possession of identifying information against an elderly person as the theft-related offenses. Except when we refer to severance of these charges, this term also refers to allegations that Coleman had stolen a purse from which the credit cards and identifying information came on the same date in Coppell, Dallas County, Texas.

The theft-related offenses involved Coleman's alleged use of stolen credit cards at a Valero gas station in Lewisville, Denton County, Texas to buy beer and cigarettes on April 15, 2016, prior to the burglary later that day. The cards came from an elderly woman's purse, which Coleman had allegedly stolen earlier that morning at a Tom Thumb in Coppell. Surveillance videos from the Valero and Tom Thumb captured clear images of the suspect and showed the same Toyota Camry at both locations. The Valero surveillance videos also showed the Toyota heading north, toward Denton, when it left the station.

The burglary took place in Denton around 4:00 p.m. at the Ridge apartments, an apartment complex with a largely college-student population. According to the complainant's trial testimony, a black male whom she had never seen before—who smelled strongly of cigarettes, and who wore navy blue or black sweatpants, a black hoodie, a white shirt, and a white hat—pushed his way into her apartment and sexually assaulted her. This was a stranger-on-stranger offense. The perpetrator took steps to conceal his identity, such as by making sure that he did not leave anything behind, taking a used condom and condom wrapper with him, making the complainant wash a t-shirt that he had used to wipe himself, and threatening to hurt the complainant if she told anyone. Surveillance videos showed the same Toyota involved in the theft-related offenses at the Ridge apartments when the burglary occurred, but it was not until later that Denton investigators discovered how the vehicle connected Coleman to both the theft-related offenses and the burglary.

The purse-theft investigation by Coppell detectives ultimately led to Coleman's identification by Denton detectives as the suspect in the burglary. Coppell detectives created a Crime Stoppers Bulletin using the theft-related surveillance videos. After they received tips naming Coleman, Coppell investigators contacted his probation officer, who positively identified Coleman from the theft-related surveillance.[3]

A few days later, Coleman's probation officer received a bulletin about the burglary; she noticed the burglary had been committed on the same date as the theft-related offenses and also noticed similarities between both offenses' suspect and vehicle descriptions. She then contacted the Denton detective investigating the burglary and provided him with Coleman's name. The Denton detective traced the Toyota's location on April 15, 2016, which led him to identify Coleman as a suspect for the burglary. Coleman was arrested and during a May 2016 interview with a Denton detective, Coleman denied having been in Denton on April 15, 2016, and denied having had sexual contact with anyone at the Ridge apartments. Years later, when the burglary went to trial and after the State had obtained DNA evidence linking Coleman to the offense, he admitted to being at the apartments and having had sex with the complainant—but he claimed it was consensual.

---

[3]Coleman's probation officer also received a description of the vehicle that the theft suspect had been driving.

5

**B. After severing the theft-related offenses, the trial court denied Coleman's motion in limine regarding those offenses.**

On the first day of trial, prior to voir dire, Coleman asked the trial court to sever the theft-related offenses from the burglary. The State replied that even if the cases were severed, it would go into the theft-related offenses in the burglary trial because those other offenses had led the police to identify Coleman for the burglary. At Coleman's repeated request, the trial court granted the severance, proceeding to trial on only the burglary.

Just prior to opening statements the following day, the trial court held a hearing outside the presence of the jury on Coleman's motion in limine and on the State's request to go into the theft-related offenses during its opening statement. The State argued that it wanted to go into these other offenses for purposes of identification as they were part and parcel of the same offense and same course of conduct, and for purposes of identity, intent, and opportunity. Overruling Coleman's motion in limine, the trial court ruled that the State could go into these offenses for identification purposes and to explain how it had linked Coleman to the offense for which he was on trial.

**C. Coleman repeatedly moved for a mistrial during the guilt–innocence phase and moved for a new trial after the jury found him guilty and assessed his punishment at ninety-nine years.**

In support of his first issue on appeal, Coleman cites four oral motions for mistrial relating to extraneous-offense evidence or his inability to prepare for trial

during the guilt–innocence phase.[4]  The trial court denied each motion.  We will discuss each motion in our analysis below.

After the jury found Coleman guilty of burglary in the guilt–innocence phase, the jury found that the enhancement paragraph (prior felony conviction for conspiracy to commit bank theft) was true and assessed his punishment at ninety-nine years' confinement during the punishment phase.  *See* Tex. Penal Code Ann. §§ 12.42(c), 30.02.  The trial court then entered judgment accordingly.

The trial court held a hearing on Coleman's motion for new trial during which he argued that his offense involved "no real violence" and that the assessed punishment was excessive and unconstitutional under the United States and Texas Constitutions, basing his argument on a summary of other cases involving lesser punishments and more violence than his offense.  The trial court denied the motion.

### III.  THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING COLEMAN'S MOTIONS FOR MISTRIAL RELATING TO EXTRANEOUS-OFFENSE EVIDENCE.

In support of his first issue, Coleman argues that the trial court erred by denying his motions for mistrial based on the admission of extraneous-offense

---

[4]Coleman also cites one written motion for mistrial that he filed during the guilt–innocence phase on both grounds.  On appeal, however, he cites no ruling on the motion, and our review of the record reflects that he neither brought this written motion to the trial court's attention nor obtained a ruling on the motion.  Because Coleman failed to obtain a ruling on the written motion, he has preserved nothing for our review, and we overrule this portion of his first issue.  *See* Tex. R. App. P. 33.1(a); *see also Collection Consultants, Inc. v. State*, 556 S.W.2d 787, 794 (Tex. Crim. App. 1977) (op. on reh'g) ("Appellant['s] failure to secure an adverse ruling on his motion for mistrial preserves nothing for review.").

evidence. He cites two oral motions for mistrial that he made on this basis: one during the State's opening statement and a second during the State's direct-examination of Detective Jason Acker—a Coppell detective who had investigated the purse theft.[5] Coleman contends that the extraneous-offense evidence was irrelevant, inflammatory, and unduly prejudicial and that it allowed the jury to convict him for being a criminal generally.

Before turning to the merits, we state our interpretation of the arguments that Coleman makes on appeal. Although he argues generally about the supposedly prejudicial effect of extraneous-offense evidence at trial, he specifically states that the trial court erred by denying his motions for mistrial. Thus, Coleman cabins our review to the issue of the refusal to grant his motions for mistrial. In other words, he does not assign error based on the claim that the trial court erroneously overruled any objections that he asserted to the admission of any specific extraneous-offense evidence under Texas Rules of Evidence 401, 403, or 404(b). And although Coleman had argued against the admission of the extraneous-offense evidence when he presented his motion in limine pretrial, the trial court's overruling of his motion in limine preserved nothing for our review. *See Swilley v. State*, 465 S.W.3d 789, 795 (Tex.

---

[5]Coleman is vague about what extraneous offenses are the subject of his complaint. In one section of his brief, he states that the "extraneous acts alleged to have been committed by [Coleman] [were the] theft of a purse and illegally using credit cards that were alleged to be in that purse with the victim in those matters being an elderly woman." Thus, we review the trial court's denial of his motions for mistrial only with respect to any references to or evidence of the purse theft in Coppell and use of stolen credit cards in Lewisville. *See* Tex. R. App. P. 38.1(f), (i).

App.—Fort Worth 2015, no pet.) (citing *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003)); *Rawlings v. State*, 874 S.W.2d 740, 742 (Tex. App.—Fort Worth 1994, no writ) ("The granting or denying of a motion in limine, without more, preserves nothing for appellate review.").

For the reasons below, we conclude that the trial court did not err by denying his two oral motions for mistrial relating to extraneous-offense evidence.

## A. Standard of review

The focus of Coleman's argument limits the breadth of our review. We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). "A mistrial is an appropriate remedy in extreme cases for a narrow class of highly prejudicial and incurable errors." *Turner v. State*, 570 S.W.3d 250, 268 (Tex. Crim. App. 2018). "It may be used to end trial proceedings when faced with error so prejudicial that expenditure of further time and expense would be wasteful and futile." *Simpson*, 119 S.W.3d at 272 (quotation marks omitted). "We review the evidence in the light most favorable to the trial court's ruling . . . and consider only those arguments before the court at the time of the ruling." *Turner*, 570 S.W.3d at 268. We will uphold the trial court's ruling if it was "within the zone of reasonable disagreement." *Id.*

Generally, to preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1);

*Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016). Further, the party must obtain an express or implicit adverse trial court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Everitt v. State*, 407 S.W.3d 259, 262–63 (Tex. Crim. App. 2013); *Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000). Because it is a systemic requirement, this court should independently review error preservation, and we have a duty to ensure that a claim is properly preserved in the trial court before we address its merits. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016); *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010) (op. on reh'g).

The traditional and preferred procedure for preserving error in the denial of a motion for mistrial is to (1) object, (2) request an instruction to disregard, and (3) move for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). When, as in this case, a party's first action is to move for mistrial, "the scope of appellate review is limited to the question whether the trial court erred in not taking the most serious action of ending the trial[.]" *Id.*

**B.  Coleman made his first motion for mistrial relating to extraneous-offense evidence during the State's opening statement.**

Coleman made his first motion for mistrial during the State's opening statement. The prosecutor described anticipated testimony from the complainant about how, on April 15, 2016, a man that she had never seen before pushed his way into her apartment, threatened her, and sexually assaulted her. The prosecutor then

summarized expected testimony from five other women living at the same apartment complex who had been approached by a man with a similar description earlier that same day. The prosecutor then argued,

> These [other] women [encountering Coleman at the apartments], as well as [the complainant], they're not the only ones that Terrence Coleman ran into that day. Because earlier in the day, Terrence Coleman started April the 15th in Coppell. [An elderly woman] is a now 90-year-old woman, who was 88 years old at the time. Five days after her 88th birthday, [she] ran into Terrence Coleman. April the 15th started out normally for [her] too. She woke up. She was going to do her weekly grocery shopping at the Tom Thumb there in Coppell off of Denton Tap Road. She goes to the bank, prior to going to Tom Thumb, to withdraw her money. She goes to Tom Thumb, gets her cart[.]

At that point, Coleman's attorney asked to approach the bench, and the trial court excused the jury. The trial court gave Coleman's attorney an opportunity to state his objection; the attorney stated,

> My client moves for a mistrial. I think counsel is raising collateral issues here that were covered by our motion in limine. And we ask that the Court grant the motion for mistrial because my client's been prejudiced in the eyes of the jury and he can't get a fair trial on this.

The trial court denied the motion for mistrial, noting that it had ruled prior to opening statements that the State could go into these other offenses for purposes of identification, and that it had overruled Coleman's motion in limine. When the jury returned, the trial court admonished the jury "that opening statements are simply a roadmap to where the attorneys believe the case will go and what the evidence may show. They're not evidence in and of themselves."

11

When the State resumed its opening statement, it summarized anticipated evidence relating to the theft-related offenses—and Coleman did not assert any further objections. The prosecutor told the jury that they would see: (1) surveillance video that showed Coleman waiting for an elderly woman inside Tom Thumb to turn her back before reaching into her cart, grabbing her purse, and leaving; (2) surveillance video that showed a silver Toyota Camry leaving the Tom Thumb, which the jury would also see at the Ridge apartment complex; (3) surveillance video that showed the same Toyota Camry at a Valero gas station, where Coleman used the stolen credit cards to buy beer and cigarettes; and (4) surveillance video that showed the Toyota Camry leaving the Valero and heading toward Denton.

The prosecutor explained, "So through this investigation with the incidents that happened in Coppell at the Tom Thumb, as well as the Valero gas station, Denton PD is able to identify [Coleman] as the suspect in this case." The prosecutor continued, "[Coleman is] arrested. And [a Denton detective] interviews him. And during that interview, [Coleman] completely denie[d] being in Denton and sexually assaulting or even having [had] any sexual encounters with anyone in Denton that day." The State then summarized anticipated DNA evidence, which, when combined with the testimony from its witnesses, it argued would lead the jury to believe beyond a reasonable doubt that Coleman was the man that had perpetrated the burglary.

Coleman's attorney then gave his opening statement, arguing that the sex was consensual.

12

**1.** **The trial court did not abuse its discretion by refusing to end the trial during the State's opening statement because the prosecutor had not yet disclosed the occurrence of the theft.**

On appeal, Coleman argues generally that "[i]n the State's opening argument, reference was made to extraneous offenses" and that "the State [brought up] the extraneous offenses" during its opening argument. He is silent about what statements, if any, provide the basis of his complaint, instead arguing globally that the State's opening statement was improper.

But Coleman made his first motion for mistrial *before* the State disclosed that a theft had occurred. The prosecutor had begun to set the scene of the events leading up to the theft, but she had not yet told the jury what offense, if any, had taken place. The State did not disclose the details of the purse theft in Coppell or the use of the stolen credit cards in Lewisville until after the trial court denied Coleman's motion.

An instruction to disregard is generally sufficient to cure error. *See Primes v. State*, 154 S.W.3d 813, 815 (Tex. App.—Fort Worth 2004, no pet.) (mem. op.) (citing *Shannon v. State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996)). A mistrial is required only in "extreme circumstances" where the prejudice, if any, is incurable. *See id.* at 814–15. Coleman provides no argument as to how any of the statements made by the prosecutor prior to his first motion for mistrial were such "highly prejudicial" and "incurable" errors, if errors at all, that they necessitated that the trial court take the "most serious action" of ending the trial. *See Young*, 137 S.W.3d at 70; *Simpson*, 119 S.W.3d at 272; *Primes*, 154 S.W.3d at 815. Because the prosecutor had not yet

13

disclosed the theft-related offenses when Coleman made his first motion for mistrial, we conclude that the trial court did not abuse its discretion by denying that motion and refusing to end the trial at that instant. *See De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009).

## 2. Regardless, Coleman waived error, if any, by failing to object to the remainder of the State's opening statement wherein it disclosed the details of the theft-related offenses to the jury.

Coleman's arguments on appeal regarding the *admission* of extraneous-offense evidence are inapposite to his first motion for mistrial during the State's opening statement. As the trial court admonished the jury, opening statements are not evidence. *See Llamas v. State*, 270 S.W.3d 274, 279 (Tex. App.—Amarillo 2008, no pet.) ("[T]he State's opening statement is not evidence[.]").

The proper method to preserve error is: (1) object; (2) request an instruction to disregard; and (3) move for a mistrial. *See Haliburton v. State*, 80 S.W.3d 309, 315 (Tex. App.—Fort Worth 2002, no pet.). Moreover, generally to preserve error, a party must object each time the objectionable evidence or statement is made. *See* Tex. R. App. P. 33.1(a)(1); *Bell v. State*, 566 S.W.3d 398, 404–05 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Temple v. State*, 342 S.W.3d 572, 603 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 390 S.W.3d 341 (Tex. Crim. App. 2013). A party must keep making futile objections or risk waiver. *Bell*, 566 S.W.3d at 405 (citing *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (concerning admission of evidence)); *see also Owens v. State*, 549 S.W.3d 735, 744 (Tex. App.—Austin 2017, pet. ref'd) ("A defendant forfeits

14

his complaint about improper jury argument if he fails to object each time such argument is made."); *Briones v. State*, 12 S.W.3d 126, 129 (Tex. App.—Fort Worth 1999, no pet.) (op. on reh'g) ("Where an impermissible argument is pursued after objection, counsel must lodge a new objection each and every time the objectionable argument is made."). An objection must also be timely—made at the time the objectionable statement is made. *See* Tex. R. App. P. 33.1(a)(1); *Haliburton*, 80 S.W.3d at 315; *see also Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012).

Even assuming without deciding that the State had erroneously disclosed facts about the extraneous offenses in its opening before Coleman moved for a mistrial, he failed to object each time the State continued to mention those facts.[6] *See Leday*, 983 S.W.2d at 718; *Owens*, 549 S.W.3d at 744. Because Coleman failed to object to the statements in the State's opening wherein it disclosed facts about the extraneous offenses after the trial court had denied his motion for mistrial, he waived his right to

---

[6]Texas Rule of Evidence 103 provides an exception to a party's obligation to renew objections when a trial court hears a party's objection outside the presence of the jury and makes a ruling that the evidence is admissible. Tex. R. Evid. 103(b). But this rule does not apply here because the trial court did not rule that the extraneous-offense evidence was admissible at trial when it denied Coleman's motion for mistrial outside the presence of the jury. Coleman did not request a ruling excluding the evidence; he only moved for a mistrial because the prosecutor was "raising collateral issues . . . covered by [his] motion in limine." The trial court's denial of the motion for mistrial was based on the fact that it had only moments earlier overruled Coleman's motion in limine, which, as noted above, preserved nothing for our review. *See Swilley*, 465 S.W.3d at 795; *see also Brock v. State*, 495 S.W.3d 1, 12 (Tex. App.—Waco 2016, pet. ref'd) (holding that error in admission of evidence was not preserved when defendant raised a Rule 403 objection at a pretrial hearing on his motion in limine).

complain on appeal about the State's subsequent actions. *See* Tex. R. App. P. 33.1(a)(1).

As we will discuss when addressing Coleman's second motion for mistrial, he also waived error, if any, by offering evidence of the same extraneous offenses during trial and by failing to object when the State introduced such evidence later. As we will also discuss, even if we were dealing with the question of the theft-related offenses' admissibility, the evidence was admissible.

Accordingly, we overrule the portion of Coleman's first issue that concerns the denial of his first motion for mistrial with regard to extraneous-offense evidence.

## C. Coleman made his second motion for mistrial relating to extraneous-offense evidence during the State's direct examination of Detective Acker.

Coleman made his second motion for mistrial on the second day of trial during the State's direct examination of Detective Acker. Prior to Coleman's motion, the detective had testified generally that he investigated fraud and financial crimes; that in April 2016 he was a criminal-investigations detective focusing on financial crimes for the Coppell Police Department; that on April 15, 2016, he heard on the radio that a purse had been stolen at Tom Thumb; and that after that dispatch came through, he noticed a silver Toyota go through an intersection.

Before the State asked its next question, Coleman's attorney asked to approach the bench, and the trial court excused the jury. Coleman's attorney then moved for a mistrial by arguing,

16

We had filed a motion in limine regarding other bad acts, including the event involving this 83-year-old [woman] whose purse was stolen on that day. It's alleged that my client did that. We had a motion in limine. Plus, we -- let me see. We filed a motion in limine and then we moved for a severance, Judge, and I believe Your Honor granted the severance. And I think it severed out the theft charge there because we wanted to keep the charges to the sexual assault and the burglary of a habitation charges before the Court.

I think letting in that other stuff just makes my client look absolutely like a horrible person. And they'll find -- once they find that he did that, they'll find him also guilty of the rape here.

We -- we -- we noticed also that yesterday, you put on [a woman who testified about encountering Coleman at the apartments] . . . whatever her name is. And then this morning there was [another woman who had encountered Coleman at the apartments]. They both testified as to other bad acts. Judge, I think counsel has -- Your Honor had required counsel to approach the bench when we wanted a -- a -- to be able to discuss these matters. Because the State didn't do that, we move for a mistrial at this time with regard to the testimony on [these two women] . . . .[7]

And now they're going into this matter here involving the theft of the purse from the 83-year-old lady. We move for a mistrial on this, Judge. This basically puts my client in a very bad position here. And because they're violating -- I believe they're violating the order. And for that reason, we're moving for a mistrial.

In response, the trial court stated, "Okay. And you have to make those objections at the time. They're not timely in this case." The trial court permitted

---

[7]We do not construe Coleman's complaint on appeal as including his reference to the testimony from these other women. *See* Tex. R. App. P. 38.1(f), (i). Even if it did, the outcome remains the same because Coleman waived any complaint relating to these women's testimony by failing to timely object at trial, as the trial court properly noted. *See* Tex. R. App. P. 33.1(a)(1)(A). Four of the women testified on the first day of trial and the fifth woman testified earlier on the second day. Coleman did not object during their testimonies, except for a few objections based on hearsay and witness leading. His brief does not challenge the admissibility of this evidence.

both sides to conduct a voir dire examination of the detective and then found that the State had "laid out sufficient grounds for the witness to testify before the jury. I'll specifically find, based on the testimony and what we've heard outside the presence of the jury, that this is for identification purposes."

Although the trial court did not expressly overrule Coleman's motion, we assume without deciding that the trial court implicitly overruled his second motion for mistrial. *See* Tex. R. App. P. 33.1(a)(2)(A).

### 1. The trial court did not abuse its discretion by refusing to end the trial because Detective Acker's testimony was not incurable error and Coleman did not first object and seek an instruction to disregard.

Coleman again argues on appeal about the admission of extraneous-offense evidence globally with respect to his second motion, without putting his motion in context. By the time Coleman moved for a mistrial, Detective Acker had only provided a general description of his background, disclosed that a purse had been stolen at Tom Thumb on April 15, 2016, and stated that a Toyota had gone through an intersection. Coleman had not objected to any of this testimony before he moved for a mistrial.

When a defendant claims on appeal that the trial court erred by admitting evidence offered by the State, the error must have been preserved for our review by a proper objection and ruling on the objection. *See Dinkins v. State*, 894 S.W.2d 330, 355 (Tex. Crim. App. 1995); *Westmoreland v. State*, 174 S.W.3d 282, 290 (Tex. App.—Tyler

18

2005, pet. ref'd); *Mack v. State*, 872 S.W.2d 36, 38 (Tex. App.—Fort Worth 1994, no writ). The objection should be made as soon as the grounds for objection become apparent. *Dinkins*, 894 S.W.2d at 355; *see also* Tex. R. App. P. 33.1(a)(1). This generally occurs when the evidence is admitted. *Dinkins*, 894 S.W.2d at 355. Thus, if a question clearly calls for an objectionable response, a defendant should make an objection before the witness responds. *Id.* If the defendant fails to object until after an objectionable question has been asked and answered, and the defendant can show no legitimate reason to justify the delay, then the objection is untimely, and error is waived. *Id.* If it does not become apparent that the evidence is objectionable until after it is admitted, then the defense must object as soon as it does become apparent and move to strike the evidence from the record. *Mack*, 872 S.W.2d at 38.

When, as in this case, a defendant's first action is to move for mistrial, our review is limited to the question whether the trial court erred by not taking the extreme action of ending the trial; in other words, an event that could have been prevented by a timely objection or cured by an instruction to the jury will not lead us to reverse a judgment on appeal when the defendant did not request these lesser remedies in the trial court. *See Young*, 137 S.W.3d at 70. Testimony referring to or implying extraneous offenses allegedly committed by the defendant may be rendered harmless by an instruction from the trial court to disregard. *See Campos v. State*, 589 S.W.2d 424, 428 (Tex. Crim. App. [Panel Op.] 1979); *Phillips v. State*, 130 S.W.3d 343, 347–48 (Tex. App.—Houston [14th Dist.] 2004) (op. on reh'g), *aff'd*, 193 S.W.3d 904

19

(Tex. Crim. App. 2006); *Asberry v. State*, 813 S.W.2d 526, 528 (Tex. App.—Dallas 1991, pet. ref'd).

Coleman fails to explain how Detective Acker's testimony *prior* to his second motion for mistrial was "highly prejudicial" and "incurable" error that necessitated the trial court granting the extreme remedy of ending the trial. *See Young*, 137 S.W.3d at 70; *Simpson*, 119 S.W.3d at 272. Coleman's attorney moved for a mistrial after Detective Acker testified about the theft; then Coleman's attorney claimed that the State had violated a limine order[8] and that the State had put Coleman in a "very bad position" and made him "look absolutely like a horrible person." Coleman offers no explanation for why he did not object to the State's questions before Detective Acker answered them. He does not argue that he did not anticipate the need for the objection until after the witness had answered the State's questions. And Coleman does not explain why an instruction to disregard, if it had been timely requested, would not have cured error, if any, in the State's examination of Detective Acker prior to his motion for mistrial. *See Campos*, 589 S.W.2d at 428.

Detective Acker's testimony did not reveal any significant details about the extraneous offenses. Even if it did, Coleman did not timely object to the State's questions or move to disregard his testimony. Thus, we conclude that the trial court did not abuse its discretion by not taking the extreme and trial-ending step of granting

---

[8]Coleman does not argue on appeal that the trial court erred by denying his second motion for mistrial based on his trial court argument that the State had allegedly violated a limine order.

Coleman's second motion for mistrial. *See De La Paz*, 279 S.W.3d at 343–44; *Young*, 137 S.W.3d at 70; *Campos*, 589 S.W.2d at 428.

2. **The trial court also did not err by denying Coleman's second motion for mistrial because Coleman had already introduced extraneous-offense evidence himself and had not objected to the State's introduction of such evidence earlier.**

Error regarding improperly admitted evidence is waived if that same evidence is brought in later by the defendant or by the State without objection—unless the evidence is brought in later in an effort to meet, rebut, destroy, deny, or explain the improperly admitted evidence. *Taylor v. State*, 264 S.W.3d 914, 918–19 (Tex. App.—Fort Worth 2008, no pet.) (mem. op.). "[A] party must object each time the inadmissible evidence is offered or obtain a running objection.[9] An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003).

Here, Coleman was the first party to introduce extraneous-offense evidence at trial. During the State's case-in-chief, the State called a witness that provided testimony through which the State admitted into evidence a recorded jail call between Coleman and another unidentified man on September 30, 2018 (a date roughly two weeks before trial). The State published only forty seconds of this roughly fifteen-minute call wherein Coleman admitted that he had been going from place to place at the apartments without making a sound. But Coleman then asked the trial court to

---

[9] *See also* Tex. R. Evid. 103.

admit and publish the entire recording for purposes of his "trial strategy," "in the interest of justice," and in the "interest of fairness."[10] The trial court granted his request and the recording was published to the jury in its entirety.

The recording revealed exchanges that arguably included bad-character evidence.[11] As pertinent here, during the call, Coleman referred to his "charges" and "indictments" in all of his "cases," and the men discussed how the State wanted to "try all of them cuz they wanna make [Coleman] sound like a thief" when it tried him for the burglary. Thus, Coleman may not complain on appeal about the State's introduction of evidence that he also introduced—particularly when he was the first to do so. *See Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) ("When a defendant offers the same testimony as that objected to, or the same

---

[10]The trial court first played the recording outside the presence of the jury for Coleman, his attorney, the trial court, and the State. The record reflects that after listening to the recording and conferring with his counsel, it was Coleman himself, and not his counsel, who made the decision to publish the entire recording to the jury.

[11]Such evidence included the men discussing the complainant's allegation that her attacker had told her that they "could do this the easy way or the hard way." The other man on the call disputed the logic of anyone making such a comment, stating that "if you're raping somebody and . . . taking some pussy, why you got to reason with her; you ain't trying to reason with no mother fucker; you just gonna do what you gonna do, and if she [unintelligible] you gonna take her out." The other man also said, "[I]f you think that you gonna be told on or something . . . most likely they ain't gonna live." Coleman expressed no objection to or disagreement with the man's comments—in the recording or at trial.

22

evidence is introduced from another source, without objection, the defendant is not in position to complain on appeal.").[12]

Moreover, between Coleman's first and second motions for mistrial, and after the trial court admitted the entire jail-call recording on Coleman's request, during the State's case-in-chief, the State called Tom Thumb's regional loss-prevention manager and a Valero gas station manager—two witnesses whose testimony related only to the extraneous offenses. Through these witnesses, the State offered and the trial court admitted into evidence surveillance videos that showed Coleman stealing the purse, the Toyota at both locations, and Coleman's using the elderly woman's stolen credit cards to buy beer and cigarettes. The trial court also admitted into evidence receipts that showed that the credit cards that Coleman had used at Valero had been issued to the elderly woman whose purse he had stolen at Tom Thumb earlier that day. Coleman either did not object to this evidence or he did not object based on Texas Rules of Evidence 401, 403, and 404(b), which provide the basis of his argument on appeal.[13]

---

[12]Coleman makes no argument on appeal that he introduced the entire recording in order to "meet, rebut, destroy, or deny" any improperly admitted evidence. He does not acknowledge the recording on appeal at all.

[13]Coleman asserted no objections during the Tom Thumb employee's direct testimony, and he asserted only leading-the-witness objections during the Valero employee's testimony. His only objections to the videos were reliability and accuracy. He objected to the receipts based on hearsay and lack of personal knowledge. He does not challenge the trial court's overruling these objections on appeal.

23

When he made his second motion for mistrial, Coleman had already requested the admission of extraneous-offense evidence himself and had allowed the State to introduce videos and receipts that showed his committing the extraneous offenses without objecting under Rules 401, 403, or 404(b). On these facts, we conclude that the trial court did not err by denying Coleman's second motion for mistrial for these additional reasons.

Moreover, after Detective Acker testified, Coleman's probation officer took the stand and testified about her involvement in identifying Coleman as the suspect in the theft-related offenses and the burglary. Other than a witness-leading objection, Coleman did not object during her testimony. When Coleman later took the stand in his own defense, he admitted without objection, among other things, that he was in the surveillance videos from Tom Thumb and Valero; that he had taken the purse; that he had used the elderly woman's credit cards; and that he had been in the Toyota.[14] Thus, error, if any, in the prior denial of his two motions for mistrial based

---

[14]Before taking the stand, the trial court admonished Coleman regarding the State's ability to cross-examine him under Texas Rule of Evidence 609. The trial court then asked, "Understanding all this, do you, knowing what your record is . . . do you still desire to proceed forward and testify before the jury?" "Yes," he responded. He then admitted that he has been convicted for the felonies of conspiracy to commit bank theft, unauthorized use of a motor vehicle, attempting/evading arrest, and felony assault against the mother of his children; that he has been convicted of failure to identify as a fugitive; and that he has been to prison. He also admitted that he had been doing drugs and drinking beer on April 15, 2016, that he has used PCP, and that he smoked cigarettes. Other than to questions relating to drug use, Coleman's attorney did not object. Coleman does not complain about the overruling of the objections to the drug questions on appeal. And he does not explain how evidence of

24

on the admission of extraneous-offense evidence was cured.  *See Valle*, 109 S.W.3d at

509.

Accordingly, we overrule the portion of Coleman's first issue that concerns the

denial of his second motion for mistrial with regard to extraneous-offense evidence.

**D.     Assuming without deciding that Coleman's briefing raises an issue regarding the trial court's ruling on the admissibility of the extraneous-offense evidence after his second motion for mistrial, the trial court did not abuse its discretion by admitting the evidence.**

In the hearing outside the presence of the jury on Coleman's second motion

for mistrial, the trial court ruled that Detective Acker could testify regarding the

extraneous offenses.  Even if we construe Coleman's arguments on appeal liberally as

including a challenge to this ruling, we conclude that the trial court did not abuse its

discretion by admitting the extraneous-offense evidence.[15]  *See* Tex. R. App. P. 38.1(f);

*see also* Tex. R. Evid. 103(b).

---

the theft-related offenses was used to convict him generally as a criminal when he admitted to so many other serious offenses.

[15]As explained above, Coleman waived his right to complain about the admission of the extraneous-offense evidence after he played the entire jail-call recording for the jury and allowed the State to introduce the surveillance videos and receipts into evidence without objecting on Rule 401, 403, or 404(b) grounds.  For this reason alone, the trial court was within its discretion to then allow the admission of such evidence when it held a hearing on its admissibility in connection with Coleman's second motion for mistrial.  Indeed, the prosecutor argued that Coleman had "opened the door" when he had admitted the jail-call recording into evidence. *See Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005) ("If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment.").

### 1. Standard of review

Generally, the admissibility of evidence is within the trial court's discretion and will not be overturned absent an abuse of discretion. *See Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019); *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). The trial court has wide latitude to admit or exclude extraneous-offense evidence. *See Wenger v. State*, 292 S.W.3d 191, 202 (Tex. App.—Fort Worth 2009, no pet.). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and we will uphold the trial court's ruling. *De La Paz*, 279 S.W.3d at 343–44.

Under Texas Rule of Evidence 404(b), evidence of extraneous offenses is not admissible to prove that, on the occasion in question, the defendant acted in conformity with character shown by other bad acts. *See* Tex. R. Evid. 404(b)(1); *see also Couret v. State*, 792 S.W.2d 106, 107 (Tex. Crim. App. 1990) ("The general rule is that an accused is entitled to be tried for the offense for which he is charged and not for some collateral crime or for being a criminal generally."). If the opponent of evidence objects on the grounds that it is not relevant, violates Rule 404(b), or constitutes an extraneous offense, the proponent must satisfy the trial court that the evidence has relevance apart from its character-conformity value. *Santellan v. State*, 939 S.W.2d 155, 168 (Tex. Crim. App. 1997); *Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (op. on reh'g).

Extraneous-offense evidence "has noncharacter-conformity relevance when it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Wenger*, 292 S.W.3d at 203 (citing Tex. R. Evid. 401, and *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). Under Rule 404(b), the "other crime, wrong, or act" may have relevance if "it tends to establish some elemental fact, such as identity or intent; that it tends to establish some evidentiary fact, such as motive, opportunity or preparation, leading inferentially to an elemental fact; or that it rebuts a defensive theory by showing, e.g., absence of mistake or accident." *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Montgomery*, 810 S.W.2d at 388–89); *see also* Tex. R. Evid. 404(b)(2); *Powell*, 63 S.W.3d at 439–40 (holding extraneous-offense evidence is admissible to rebut a defensive theory raised by a defendant).

Extraneous-offense evidence may also be admissible as same-transaction contextual evidence. *See Prible v. State*, 175 S.W.3d 724, 732 (Tex. Crim. App. 2005). "Same-transaction contextual evidence results when an extraneous matter is so intertwined with the State's proof of the charged crime that avoiding reference to it would make the State's case incomplete or difficult to understand." *Id.* The purpose of same-transaction contextual evidence "is to put the instant offense in context." *Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). The Texas Court of Criminal Appeals has stated that "it has long been the rule in this State that the jury is entitled to know all relevant surrounding facts and

circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). Same-transaction contextual evidence "is admissible only when the offense would make little or no sense without also bringing in the same transaction evidence." *Wyatt*, 23 S.W.3d at 25 (quotation marks omitted).

Whether extraneous-offense evidence has relevance apart from character conformity is a question for the trial court. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's ruling admitting extraneous-offense evidence is generally within the zone of reasonable disagreement "if there is evidence supporting that an extraneous transaction is relevant to a material, non-propensity issue." *Id.* If the trial court's evidentiary ruling is correct on any theory of law applicable to that rule, it will not be disturbed, even if the trial court gives the wrong reason for its correct ruling. *Id.*

### 2. The trial court's conclusion that the extraneous-offense evidence was admissible was within the zone of reasonable disagreement.

We conclude that the trial court's ruling admitting Detective Acker's testimony was not error because it was admissible to rebut Coleman's consent defense and to put the instant offense in context. *See De La Paz*, 279 S.W.3d at 343–44. Instead, that ruling was well within the trial court's discretion to make.

28

### a. The extraneous-offense evidence was admissible to rebut Coleman's consent defense.

Coleman first raised his defense of consent in his opening statement. *See Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) ("[A]lthough a defensive opening statement is not itself evidence, the statement does inform the jury and the State of the nature of the defense to be raised[,] and the State may rebut this anticipated defensive evidence in its case-in-chief."). He continued to raise this defense throughout trial. For example, his attorney asked the complainant (the first witness) questions about whether she had made up the sexual assault to cover up having sex with Coleman. And during Coleman's testimony, he claimed that the complainant had invited him in and that the sex was consensual. By taking the stand, Coleman also placed the credibility of his testimony into issue. *See Badall v. State*, 216 S.W.3d 865, 870 (Tex. App.—Beaumont 2007, pet. ref'd).

By claiming consent, Coleman made extraneous-offense evidence admissible for the State to rebut this defense and to prove, among other things, that (1) the complainant did not consent to his entry into her apartment; (2) he entered with the intent to commit sexual assault; and (3) the complainant did not consent to sexual contact or penetration.[16] *See* Tex. Penal Code Ann. §§ 22.011(a)–(b), 30.02(a); Tex. R.

---

[16]An extraneous offense is also admissible to prove the culpable mental state required for the charged offense if the required intent cannot be inferred from the act itself or if the accused presents evidence to rebut that inference. *See* Tex. R. Evid. 401, 404(b); *Rubio v. State*, 607 S.W.2d 498, 501 (Tex. Crim. App. 1980) ("We hold that when a defendant in a prosecution for rape raises the defensive theory of consent, he

Evid. 401, 404(b); *see also Powell*, 63 S.W.3d at 439–40; *Mason v. State*, 416 S.W.3d 720, 740 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Segundo v. State*, 270 S.W.3d 79, 86 (Tex. Crim. App. 2008)).

Evidence relating to the theft-related offenses, the related investigation, and how that investigation led to Coleman's identification was relevant to rebutting his defense. This was a stranger-on-stranger offense. The complainant had testified that she had never seen her attacker before. Her testimony reflected efforts taken by the man who had attacked her to conceal his identity, and he had threatened to come back and hurt her if she told anyone. After Coleman was arrested for the theft-related offenses, a Denton detective conducted a videotaped interview with Coleman in May 2016; in that interview Coleman denied being in Denton or having sexual contact with anyone at the Ridge apartments on April 15, 2016.

The fact that Coleman resorted to the defense of consent only after authorities were able to place him at the Ridge apartments on the date of the offense gave the jury an objective means to test Coleman's credibility that they otherwise would not have had. Without an insight into why the evidence forced Coleman to resort to that defense, the issue would have been the complainant's word against Coleman's.

---

places his intent in issue. The State may then offer extraneous offenses that are relevant to that contested issue."); *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.) (holding that extraneous offense was admissible because the defendant had used the State's witnesses to establish a defensive theory that the complainant had engaged in consensual sex and had fabricated the charge of sexual assault after the fact).

Specifically, Coleman's defense morphed into consent only after he was tied to the offense by the chain of events on April 15, 2016, that had placed him at the complainant's apartment complex and by the DNA evidence that placed him in contact with the complainant. The surveillance from Tom Thumb and Valero on the day of the offense placed Coleman with the Toyota heading toward Denton where surveillance video and other testimony showed the same vehicle approaching several women at the Ridge apartments before the complainant later saw him exit the vehicle and then attack her. He then left her apartment after removing or attempting to destroy all evidence that could identify him.

The only reason that Coleman became a suspect in the burglary was because his probation officer happened to receive bulletins about both offenses and noticed similarities in the suspect and vehicle descriptions—despite Coleman's attempts to conceal his identity and to coerce the complainant into not reporting the offense. Simply, the fact that the State's evidence forced Coleman into this defense of last resort was a relevant consideration on the question of his defense's credibility.

Coleman also made the theft-related investigation central to his consent defense. At a later point in the trial, his attorney cross-examined the Denton detective who conducted the videotaped interview with Coleman in May 2016. Coleman's attorney asked multiple questions about the theft-related investigation to suggest that the detective had "ambushed" Coleman with questions about the burglary during that interview because Coleman had the impression that the purpose of the interview was

31

to discuss the theft-related offenses.  When Coleman took the stand, he testified that when he was being questioned by the Denton detective, he did not think that he was going to be asked about sexual-assault allegations; he testified, "I thought he was coming to talk to me about my current charges I was locked up on . . . credit card abuse.  I thought he was coming to talk to me about credit cards.  The first 45 minutes of the interview he conducted was about credit cards."  He further testified, "I didn't want to put myself in the vicinity with . . . the credit cards" during that interview.  So not only did Coleman introduce extraneous-offense evidence again,[17] but he used the theft-related investigation to try to explain away the contrary position that he had taken in May 2016 during his interview about having had consensual sex with the complainant.

### b. The extraneous-offense evidence was admissible as same-transaction contextual evidence.

The evidence was also admissible as same-transaction contextual evidence because the events of April 15, 2016, and the investigation into how Coleman became a suspect for the burglary was necessary for the jury's understanding of the State's case.  In addition to showing the culpable intent, the evidence explained why the investigation focused on Coleman for the burglary and displayed the "crime spree" nature of his activities on that day.  *See Devoe*, 354 S.W.3d at 469–71.  Coleman started

---

[17]Because of Coleman's questioning of this witness, error, if any, in the admission of Detective Acker's testimony was also cured.  *See Taylor*, 264 S.W.3d at 918–19.

his day in Coppell where he stole the elderly woman's purse; he used her stolen credit cards to buy beer and cigarettes after traveling to Lewisville; and he then continued traveling to Denton in the same Toyota where he approached several women at the Ridge apartments—exiting and entering the complex on multiple occasions—and then attacked the complainant. This crime spree was part of the surrounding facts and circumstances of the charged offense and put the burglary in context. *See id.* at 469; *see also Smith v. State*, 424 S.W.3d 588, 594 (Tex. App.—Texarkana 2013, no pet.).

Without the extraneous-offense evidence, the State could provide no explanation as to how investigators had selected Coleman out of all the black males in the world as the suspect for the burglary in this stranger-on-stranger offense. The complainant did not know him, and the State did not have a suspect to match to the DNA evidence it had obtained from the complainant. At the same time, Coleman testified that he had obtained the complainant's phone number and that she had told him to give her a call. One of his arguments at trial was that she had made up the sexual assault to cover up the consensual sex because she had a boyfriend.[18] If the theft-related investigation had been excluded, Coleman's story suggested an explanation for how he was identified: the complainant had remained in contact with him after having consensual sex. In other words, exclusion of the evidence made this

---

[18]Coleman's attorney cross-examined the complainant on whether she had made up the sexual assault because she had a boyfriend at the time, and he continued this theme during his closing argument.

more like a "he-said, she-said" case. Admission of the evidence made it more like a "he tried to get away with it (and he almost did)" case.

Providing context to a charged offense to explain the circumstances surrounding the offense and why investigators focused on a suspect is not a novel use of extraneous-offense evidence. *See Devoe*, 354 S.W.3d at 469–71; *see also Marshall v. State*, No. 12-14-00368-CR, 2016 WL 3703187, at *7 (Tex. App.—Tyler July 12, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding that evidence of defendant's prior assault of a woman was admissible "to show how [the defendant] became a suspect" in the sexual assault for which he was on trial; he became a suspect when a detective noticed similarities in the women's stories); *Denmon v. State*, No. 03-12-00347-CR, 2014 WL 857671, at *4 (Tex. App.—Austin Feb. 27, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that detective's testimony about a prior investigation for the same type of offense was admissible to explain "why the investigation had focused" on the defendant in indecent-exposure case); *Greene v. State*, 287 S.W.3d 277, 283 (Tex. App.—Eastland 2009, pet. ref'd) (concluding that evidence of defendant's prior arrest was admissible to explain how that arrest had led to an investigation of defendant for child sexual assault because the timing of the sexual-assault investigation and the child's subsequent outcry made little or no sense without the evidence); *Swarb*, 125 S.W.3d at 682 (concluding that during trial for controlled-substance possession, evidence that officers had been serving a warrant for defendant's arrest when they found methamphetamine in his vehicle was

34

admissible to explain why the officers were searching for him and how they had found the methamphetamine in his truck); *Victor v. State*, 995 S.W.2d 216, 223–24 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (concluding that evidence that defendant was under arrest from another investigation when officers found cocaine in his possession was admissible as same-transaction contextual evidence during trial for cocaine possession).

Coleman argues that using the extraneous-offense evidence "to establish his identity" was erroneous because he did not challenge his identity at trial. We disagree. First, Coleman is conflating the use of extraneous-offense evidence to prove "identity" with contextual evidence explaining why investigators focused on him as a suspect for the burglary. Although the trial court used the term "identification," the substance of the arguments and the trial court's ruling indicate that it was referring to its use as contextual evidence. *See also Devoe*, 354 S.W.3d at 469.

Second, the fact that the complainant identified Coleman in court as the perpetrator and that the State later introduced DNA evidence linking Coleman to the offense does not answer the question of why Denton investigators had focused on Coleman in the first place—so that the complainant could identify him or so that the State could obtain DNA evidence. How Coleman became a suspect made little or no sense without also bringing in the surrounding facts and circumstances of the investigation into the theft-related offenses. *See Moreno*, 721 S.W.2d at 301.

35

Moreover, Coleman did challenge his identity at trial even if he did so indirectly. He questioned the accuracy of the DNA evidence, suggested it had been contaminated, and questioned its source. He objected to the admission of DNA-related exhibits. He obtained testimony from a Denton investigator stating that Coleman's clothing on the day of the offense was common among black males and that this investigator did not know who had been driving the Toyota at the apartments. And Coleman testified that another black male (Dontrell) had been at the apartments and had been driving the Toyota on the day of the offense. Coleman also repeatedly raised the fact that the complainant had a black boyfriend, and Coleman used this as an explanation for why she would be willing to have sex with him minutes after meeting him.[19] So although Coleman admitted to having sex with the complainant to explain the DNA evidence, he nonetheless disputed his identity as the man who had attacked the complainant, suggesting that she was sexually assaulted by Dontrell or another black male in addition to having had sex with Coleman. *See* Tex.

---

[19]For example, during closing arguments, Coleman's attorney argued,

it doesn't take long for two people, if they click, to decide if they want to get together. . . . [S]he's had boyfriends, other boyfriends. The evidence is that she's had a boyfriend, and a black boyfriend.

So this is not her first rodeo, so to speak. . . . She knew what she wanted to do and she went up and they had sex. . . . [T]his is a case where she gives [Coleman] her telephone number. . . . They were planning a hookup later on. . . . [S]he had remorse and maybe she felt badly about it. . . . Dontrell was in that Toyota Camry[,] and he's the one . . . who . . . had possession of that vehicle. Not [Coleman].

36

R. Evid. 404(b). The investigation into the extraneous-offense evidence corroborated the identification provided by the complainant and the DNA evidence, which Coleman did attack, even if indirectly, at trial.

Coleman argues that the extraneous-offense evidence was inadmissible because there was "no similarity between the charged offense and the extraneous offenses" and because "[b]urglary of a habitation has nothing in common with theft or credit card abuse as the elements are completely dissimilar." We disagree. The fact that an extraneous offense occurs at a different time, on a different day, or in a different place than the charged offense or that it involves a different type of offense does not automatically negate its admissibility as same-transaction contextual evidence.

For example, in *Devoe*, the appellant was convicted for murdering a teenage girl and her friend who had been staying the night on August 24, 2007. 354 S.W.3d at 461, 463. These murders were part of a single crime spree spanning several days across different states involving different victims and different crimes. *See id.* at 471. Specifically, on August 24, the appellant stole a gun from a friend and went home and took a nap. *Id.* at 462. When the woman he lived with woke him up and told him to leave, the appellant pointed the gun at her head. *Id.* The woman escaped, and the appellant left while stealing her truck, money, and credit cards. *Id.* That evening, the appellant drove the truck to a bar where he found an ex-girlfriend, put the gun against her head, and pulled the trigger, but the gun jammed. *Id.* at 463. When a bartender stepped between the ex-girlfriend and the appellant, the appellant shot and killed him.

*Id.* Later that night, the father of the murdered teenage friend became worried when his daughter did not call. *Id.* He saw news of the bartender's murder on the internet and that police were looking for the truck. *Id.* The following morning, the father drove to the home where his daughter was staying and saw the truck described on the internet parked nearby. *Id.* at 464. When police arrived, they discovered the bodies of the two teenage girls, the other girl's mother, and the mother's boyfriend—all shot to death. *Id.* The boyfriend's phone and the mother's vehicle had been stolen. *Id.* Use of the stolen credit cards and stolen phone showed the appellant's route toward New York through August 26. *Id.* On August 26, the appellant, armed with a gun, went into a woman's home in Pennsylvania and stole her vehicle. *Id.* at 464–66. He was captured the following day. *Id.* at 465. The bullets from all the murders matched the stolen gun. *Id.* at 466. Among other DNA evidence, blood from the teenage girl's mother's boyfriend and the bartender was identified on appellant's boots. *Id.*

The appellant in *Devoe* argued that it was error under Rule 404(b) to admit evidence of the gun theft, the assault of the woman with whom he lived, the killing of the bartender, and the robbery of the woman in Pennsylvania. *Id.* at 468–69. The Texas Court of Criminal Appeals disagreed, holding that the evidence was admissible as same-transaction contextual evidence because he did not rest between incidents and because the charged offense would make little sense without the extraneous offenses. *Id.* at 470–71. The court rejected the appellant's argument that the evidence was unnecessary when he did not challenge the State's version of events. *Id.* The

38

court reasoned that the appellant did not plead guilty; he argued against a finding of guilt at closing; and "aside from the identity issue, the State needed all of this evidence to give context to [his] 'crime spree' as he stole the gun to go after women with whom he had had personal relationships and to then effectuate his flight to his mother's home." *Id.* at 471.

Similarly, Coleman did not plead guilty, he argued against a finding of guilt at closing, and the State needed the evidence to give context to his consent defense and to his crime spree where he had spent the day preying on various women while driving the Toyota, which ultimately tied him to the crime.

Accordingly, the trial court acted well within its discretion by admitting the evidence because it was relevant to a host of material, non-propensity issues. *See Devoe*, 354 S.W.3d at 469.

### 3. The trial court's implied finding that the probative value of the extraneous-offense evidence was not substantially outweighed by unfair prejudice, if any, was within the zone of reasonable disagreement.

If extraneous-offense evidence is relevant under Texas Rule of Evidence 401, but the defendant objects to its admission under Texas Rule of Evidence 403, the trial court has a nondiscretionary obligation to weigh the probative value of the evidence against the unfair prejudice of its admission. *See* Tex. R. Evid. 403. "Rule 403 favors admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim.

App. 2007); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Although a trial court must perform a balancing test for same-transaction contextual evidence if a defendant objects under Rule 403, "the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the whole criminal transaction." *Smith v. State*, 316 S.W.3d 688, 699 (Tex. App.—Fort Worth 2010, pet. ref'd); *see also King v. State*, 189 S.W.3d 347, 354–55 (Tex. App.—Fort Worth 2006, no pet.) (same).

On appeal, Coleman cites Rule 403 and argues that the extraneous-offense evidence allowed the jury to convict him for being a criminal generally and not for the commission of the burglary. A party, however, has an obligation to invoke Rule 403 in the trial court in order to complain on appeal that the evidence was inadmissible under that Rule. *See* Tex. R. App. P. 33.1(a)(1); *Montgomery*, 810 S.W.2d at 389. An objection that extraneous-offense evidence has no relevance beyond character conformity and, thus, is inadmissible is insufficient to ask the trial court to rule on whether such evidence, if relevant, should nonetheless be excluded under Rule 403. *See Montgomery*, 810 S.W.2d at 389.

Coleman did not expressly invoke Rule 403 in either of his two oral motions for mistrial; his arguments were, at best, based on relevance and the character-conforming nature of the evidence. *See* Tex. R. Evid. 401, 403, 404(b)(1); *Montgomery*, 810 S.W.2d at 389. Coleman's general reference to being "prejudiced" was not specific enough to assert an objection under Rule 403. *See* Tex. R. App. P.

40

33.1(a)(1)(A); *see also, e.g.*, *Lumsden v. State*, 564 S.W.3d 858, 898–99 (Tex. App.—Fort Worth 2018, pet. ref'd) (holding that an objection "as to the hearsay nature of the contents [of documents], Your Honor, unfairly prejudicial to the Defendant" was not specific enough to preserve error based on Rule 403), *cert. denied*, 139 S. Ct. 2018 (2019). Thus, Coleman's argument on appeal that the extraneous-offense evidence was inadmissible under Rule 403 is different from the argument that he made in the trial court, thus waiving the issue on appeal. *See* Tex. R. App. P. 33.1(a); *Euziere v. State*, 648 S.W.2d 700, 703 (Tex. Crim. App. 1983) ("[A]n objection raised on appeal will not be considered if it varies from the objection made at trial.").

Nonetheless, assuming without deciding that he made an objection under Rule 403 during trial that was apparent to the trial court from the context based on Coleman's pretrial arguments on his motion in limine, and assuming without deciding that the trial court implicitly overruled the Rule 403 objections when it denied Coleman's motions for mistrial, we conclude that the trial court did not abuse its discretion by overruling such objections. *See* Tex. R. App. P. 33.1(a)(1)(A), (2)(A); *Colone*, 573 S.W.3d at 263–64.

In making a Rule 403 determination, a court must evaluate the following factors:

(1)    how compellingly the extraneous-offense evidence serves to make a fact of consequence more or less probable—a factor relating to the strength of the evidence presented by the proponent to show that the defendant, in fact, committed the extraneous offense;

(2)   the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way";

(3)   the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and

(4)   the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*See Wyatt*, 23 S.W.3d at 26 (citing *Montgomery*, 810 S.W.2d at 389–90). By overruling a Rule 403 objection, we assume that the trial court applied a Rule 403 balancing test and determined that the evidence was admissible; the trial court is not required to perform the balancing test on the record. *See Wenger*, 292 S.W.3d at 204. "If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004) (op. on reh'g). We address each of the four factors below.

First, Coleman argues that "the dissimilarities between the extraneous offenses and the instant one compels that the extraneous offenses should have been excluded." We disagree. As explained above, evidence from the investigation of the theft-related offenses explained how Coleman became a suspect in this stranger-on-stranger offense and rebutted his consent defense. *See Devoe*, 354 S.W.3d at 470. The fact that the theft-related offenses are different from burglary and sexual assault misses the point about the relevance of the evidence. *See id.* at 469–71. Further, "[t]he exactness

42

that might be required of an offense committed at a more remote period of time might not necessarily be required for an offense committed within a very short period of time." *Johnson v. State*, 68 S.W.3d 644, 650–51 (Tex. Crim. App. 2002). Here, Coleman committed the offenses within hours of each other—wearing the same clothing; traveling in the same vehicle; and smelling of cigarettes, which he had bought using the credit cards that he had stolen earlier that day. The course of the theft-related investigation and Coleman's position about having had no contact with the complainant during that investigation contradicted his consent defense at trial, as explained above. The evidence was highly probative. This factor weighs in favor of admission.

Second, Coleman argues that the extraneous-offense evidence "allowed for the conviction of the defendant based upon the age of the victim in that [theft-related] offense and the offensiveness of that conduct alone." We disagree. This factor concerns the nature of the misconduct. *See Montgomery*, 810 S.W.2d at 390. Here, the extraneous offenses concerned theft of a purse and use of stolen credit cards. While the offenses against an elderly woman may have been offensive, we cannot say that they were more offensive than the offense for which he was on trial—burglary with the intent to commit sexual assault. Additionally, the elderly woman did not testify during the guilt–innocence phase. The only evidence of her age admitted at this stage of trial was through a surveillance video that showed Coleman stealing her purse— and, as noted above, Coleman lodged no Rule 403 objection when the State moved to

43

admit that video. Coleman also does not address the fact that when he took the stand to testify, he admitted to having been convicted of several prior offenses. This factor weighs in favor of admission.

Third, Coleman argues that the State devoted one-sixth of the trial to introducing extraneous-offense evidence. This is not accurate. The State called twenty-two witnesses during the guilt–innocence phase. Coleman cites only four out of these twenty-two witnesses as being devoted to the extraneous-offense evidence: (1) the Tom Thumb loss-prevention employee; (2) the Valero manager; (3) Detective Acker; and (4) Coleman's probation officer. Based on our review of the record, these witnesses testified before the jury for roughly ten percent of the trial. Further, the evidence described a complicated chain of events. The State did not belabor the point and took only the time needed to connect the dots. And Coleman objected only to Detective Acker testifying about the theft-related offenses. This factor weighs in favor of admission.

Finally, Coleman argues that after the complainant had identified him in open court, there was no fact of consequence (identity) at issue because he did not contest identification at trial and because the State had DNA evidence. We disagree. As explained above, the jury was entitled to know all facts and circumstances leading to Coleman's identification as the suspect in this case and to consider how the State's ability to tie him to the offense undermined his defense of consent. *See Johnson*, 68 S.W.3d at 651 (holding that extraneous offenses placed the primary offense in context

44

of a scheme carried out that night and tended to prove the defendant's identity as the perpetrator, despite the State having DNA evidence and the defendant's admissions of guilt). Without the extraneous-offense evidence, how the investigation had focused on Coleman would have made no sense.[20] This factor weighs in favor of admission.

All four factors weigh in favor of admission because they show that the extraneous-offense evidence was more probative than prejudicial. Accordingly, the trial court's rulings that the extraneous-offense evidence was relevant for purposes we have cataloged and that its probative value was not substantially outweighed by the danger of unfair prejudice were within the zone of reasonable disagreement. Thus, we hold that the trial court did not abuse its discretion by admitting such evidence at trial. *See Gallo*, 239 S.W.3d at 762; *King*, 189 S.W.3d at 354–56.

We overrule the portion of Coleman's first issue relating to the admission of extraneous-offense evidence.

---

[20]Coleman also argues that the trial court's limiting instruction in the jury charge was too late to cure the prejudicial nature of the extraneous-offense evidence introduced throughout the trial. A limiting instruction, however, is not required when extraneous-offense evidence is admitted as same-transaction contextual evidence. *See Devoe*, 354 S.W.3d at 471; *Camacho v. State*, 864 S.W.2d 524, 534–35 (Tex. Crim. App. 1993). Even still, the trial court included a limiting instruction in the jury charge, and it also admonished the jury at end the of the State's case-in-chief and at other points in trial on the limited use of extraneous-offense evidence.

## IV. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING COLEMAN'S ORAL MOTIONS FOR MISTRIAL BASED ON AN INABILITY TO PREPARE FOR TRIAL.

Coleman argues that the trial court erred by denying his motions for mistrial based on his inability to properly prepare for scientific or technical testimony.[21] He cites two oral motions for mistrial that he made during the State's direct examination of two forensic experts. These motions for mistrial were premised on the trial court's prior denial of his oral motions for continuance. Because the trial court was within its discretion to deny his oral motions for continuance, we conclude that trial court did not abuse its discretion by denying his subsequent motions for mistrial.

### A. Coleman made several pretrial oral motions for continuance after engaging a new attorney weeks before trial.

Coleman's claimed basis for needing more time to prepare was based on his counsel's contention that he had just two weeks to prepare for trial. By the time of trial, Coleman had been represented by four different attorneys. His first two appointed attorneys each withdrew within months of their appointments. And Coleman's third appointed attorney withdrew at a September 21, 2018 hearing—after Coleman had told her to not come back earlier that week and then represented to the trial court at the hearing that he had retained new counsel, Richard Deaguero, who had not yet made an appearance. The trial court made it clear that it would not

---

[21]Coleman's two grounds for seeking a mistrial work against each other. On the one hand, he argues that his identity was not in dispute, so the theft-related offenses were not admissible to prove identity. But on the other hand, he argues that he needed more time to rebut the DNA evidence, which concerned identity.

continue the case as a result of the new attorney, reiterating, "[W]e're going to trial October 15th."

When Deaguero appeared, he claimed that he lacked sufficient time to prepare by October 15, 2018, and he orally moved for a continuance on multiple occasions: (1) at a September 28, 2018 status hearing; (2) twice at an October 3, 2018 docket call; (3) twice the morning of the first day of trial; and (4) the following day just prior to opening statements. The trial court denied each motion.

## B. The error that Coleman points to as the basis for his requested new trial is the denial of his numerous motions for continuance.

During trial, Deaguero orally moved for a mistrial twice based on an inability to prepare. Deaguero made the first oral motion when the State moved to admit a laboratory report during its examination of the expert who had supervised the forensic serology testing in the case. He moved for a mistrial again when the State moved to introduce a report during its examination of a senior forensic DNA analyst. The trial court denied both motions.

Coleman's references to Deaguero's alleged inability to prepare for trial point to the trial court's denial of his motions for continuance as the error that he claims necessitated a mistrial. In his briefing on this issue, the only authority that he cites in support of his argument is *Heiselbetz v. State*, which involved a ruling on a motion for continuance. 906 S.W.2d 500, 511 (Tex. Crim. App. 1995). Coleman then argues that he "was harmed by the trial court's rulings regarding his inability to properly prepare

47

for the cross-examination of expert witnesses as he had . . . an inadequate amount of time to prepare for same and obtain any review by his own expert."

Although Coleman states his argument on appeal in terms of the trial court's denial of his motions for mistrial, the substance of his argument concerns the trial court's denying his motions for continuance. We turn to the question of whether the trial court erred by denying Coleman's motions for continuance. *See, e.g.*, *Price v. State*, No. 14-96-00982-CR, 1999 WL 516089, at *1–2 (Tex. App.—Houston [14th Dist.] July 22, 1999, pet. ref'd) (not designated for publication) (applying the law governing a motion for continuance when defendant argued on appeal that the trial court erred by denying motion for mistrial based on his counsel's inability to prepare for trial). We resolve this question against Coleman.

**C.    The trial court acted within its discretion by denying Coleman's unsworn, oral motions for continuance, which preserved nothing for our review regarding the substance of the motions.**

We review the denial of a motion for continuance for an abuse of discretion, giving a wide degree of deference to the trial court. *See Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). Before trial, "[a] criminal action may be continued on the *written* motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion. A continuance may be only for as long as is necessary." Tex. Code Crim. Proc. Ann. art. 29.03 (emphasis added). During trial,

48

[a] continuance or postponement may be granted on the motion of the State or defendant after the trial has begun, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had.

*Id.* art. 29.13. But Article 29.08 provides, "*[a]ll* motions for continuance must be *sworn* to by a person having knowledge of the facts relied on for the continuance." *Id.* art. 29.08 (emphases added). Thus, if a party makes an unsworn, oral motion for continuance before or during trial and the trial court denies it, then the party forfeits the right to complain on appeal about the trial court's ruling. *See Anderson v. State*, 301 S.W.3d 276, 279–81 (Tex. Crim. App. 2009) (holding that pretrial oral motion for continuance failed to preserve for appellate review complaint that the trial judge erred by denying motion); *Dewberry v. State*, 4 S.W.3d 735, 755–56 (Tex. Crim. App. 1999) (holding that three oral motions for continuance during trial preserved nothing for appellate review); *Matamoros v. State*, 901 S.W.2d 470, 478 (Tex. Crim. App. 1995) (holding that oral motion for continuance after conclusion of the State's case-in-chief did not preserve error for appellate review); *Robinson v. State*, 310 S.W.3d 574, 578–79 (Tex. App.—Fort Worth 2010, no pet.) ("[T]he denial of an oral motion for continuance preserves nothing for our review.").

Coleman failed to preserve anything for our review regarding the motions for continuance that he cites on appeal because they were all oral motions. The record does not reflect that Coleman ever filed a written, sworn motion for continuance. Consequently, we do not reach the question of whether the trial court abused its

discretion by denying Coleman's motions for continuance on their merits or whether he was prejudiced as a result of the trial court's rulings. *See Heiselbetz*, 906 S.W.2d at 511 (holding that a defendant challenging a trial court's denial of a motion for continuance due to an inability to prepare must show that he was actually prejudiced by his counsel's inadequate preparation time). Because all of Coleman's motions for continuance were oral motions, the trial court did not err by denying his motions for mistrial based on an inability to prepare for trial. *See Hightower v. State*, 629 S.W.2d 920, 926 (Tex. Crim. App. [Panel Op.] 1981) ("There is no abuse of discretion in failing to grant an oral motion for continuance.").

Accordingly, we overrule the remaining portion of Coleman's first issue.

## V. THE TRIAL COURT DID NOT VIOLATE COLEMAN'S CONSTITUTIONAL RIGHTS TO BE FREE AND UNUSUAL PUNISHMENT BY DENYING A MOTION FOR NEW TRIAL AFTER IMPOSING A NINETY-NINE-YEAR SENTENCE.

In his second issue, Coleman argues that the trial court should have granted his motion for new trial because, as he raised in his motion for new trial, his burglary sentence is excessive, cruel, and unusual in violation of the United States and Texas Constitutions.[22] The trial court held a hearing and denied the motion. Thus, this issue is preserved for our review.

The jury found Coleman guilty of burglary of a habitation with the intent to commit sexual assault and also found that the enhancement paragraph alleging

---

[22]Coleman also premised his motion for new trial on two other grounds that he does not raise on appeal.

Coleman's prior conviction for the offense of conspiracy to commit bank theft was true. Thus, the offense for which Coleman was sentenced is a first-degree felony under Section 30.02 of the Texas Penal Code with a punishment range of not less than fifteen years or more than ninety-nine years, or life. *See* Tex. Penal Code Ann. §§ 12.42(c), 30.02. The jury assessed his punishment at ninety-nine years; the punishment was, thus, within the statutory range.

## A. Standard of review

We review the trial court's decision to grant or deny a motion for new trial under an abuse-of-discretion standard. *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001). We do not substitute our judgment for that of the trial court; rather, we review the trial court's decision to determine whether it was unreasonable or arbitrary. *See id.*

## B. Applicable law governing the gross disproportionality of punishment

Proportionality of punishment is embodied in the Eighth Amendment's ban on cruel and unusual punishment and requires that the punishment fit the offense. U.S. Const. amend. VIII. Similarly, the Texas Constitution prohibits cruel or unusual punishment.[23] Tex. Const. art. I, § 13. Generally, a sentence within the statutory

---

[23]Coleman also cites Article I, Section 19 of the Texas Constitution, which states, "No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. He does not explain his reference to Article I, Section 19 or assert any due-course-of-law argument. This court will not make legal arguments for Coleman. To the extent that Coleman raised any challenge under

51

range of punishment is not excessive, cruel, or unusual under the Eighth Amendment, and we will not disturb it on appeal.[24]  *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (citing *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006)); *McCann v. State*, No. 02-16-00450-CR, 2017 WL 3428849, at *3 (Tex. App.— Fort Worth Aug. 10, 2017, pet. ref'd) (mem. op., not designated for publication).  The Texas Court of Criminal Appeals has stated that a "sentencer's discretion to impose any punishment within the prescribed range [is] essentially 'unfettered.'"  *Chavez*, 213 S.W.3d at 323.

---

Article I, Section 19 of the Texas Constitution, the issue is inadequately briefed.  *See* Tex. R. App. P. 38.1(f), (i).

[24]As to the Texas Constitution, Coleman argues,

[The Texas] Constitution can provide additional protections for criminal defendants beyond those required by the U.S. Constitution.  *See Heitman v. State*, 815 S.W.2d 681, 683 n. 1 (Tex. Crim. App. 1991).  In this matter, Appellant requests this court to find that the Texas Constitution afford greater protections for the accused than that of the United States Constitution.  Appellant understands that the Court of Criminal Appeals has spoken on the subject.  *See Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997).  Given the grossly excessive punishment in this matter, Appellant believes that this Court should revisit the matter.

In *Cantu*, the Texas Court of Criminal Appeals rejected an argument that the Texas Constitution should be interpreted in a more expansive manner than the federal constitution, finding "no significance in the difference between the Eighth Amendment's 'cruel and unusual' phrasing and the 'cruel *or* unusual' phrasing of Art. I, Sec. 13 of the Texas Constitution."  939 S.W.2d at 645.  We are bound by the Texas Court of Criminal Appeals' authority in *Cantu* and our analysis of the Eighth Amendment applies equally to Article I, Section 13 of the Texas Constitution.

52

Even a sentence falling within the statutory range of punishment, however, must be proportional to the crime. *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983). Thus, a "very limited, 'exceedingly rare,' and somewhat amorphous" exception exists to the general rule for sentences that fall within the statutory range of punishment but are nevertheless grossly disproportionate to the offense. *Chavez*, 213 S.W.3d at 323–24.

To determine whether a sentence is grossly disproportionate for a particular crime, we must first make a threshold comparison of the gravity of the offense against the severity of the sentence. *Moore v. State*, 54 S.W.3d 529, 542 (Tex. App.—Fort Worth 2001, pet. ref'd) (citing *Solem*, 463 U.S. at 291–92, 103 S. Ct. at 3010, and *McGruder v. Puckett*, 954 F.2d 313, 315 (5th Cir. 1992)). In making this comparison, the court must examine (1) the sentence's severity in light of the harm caused or threatened to the victim, (2) the offender's culpability, and (3) the offender's prior adjudicated and unadjudicated offenses. *Simpson*, 488 S.W.3d at 323 (citing *Graham v. Florida*, 560 U.S. 48, 60, 130 S. Ct. 2011, 2021–22 (2010)); *Moore*, 54 S.W.3d at 542. In those rare instances when this threshold is met and gross disproportionality is determined, the court must compare the defendant's sentence with sentences given to other defendants in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions. *Simpson*, 488 S.W.3d at 323 (citing *Graham*, 560 U.S. at 60, 130 S. Ct. at 2022); *Moore*, 54 S.W.3d at 542.

**C.** **The trial court did not err by denying Coleman's motion for new trial because his ninety-nine-year sentence is not grossly disproportionate.**

Coleman does not contest that his ninety-nine-year sentence is within the applicable statutory range of punishment. Thus, we turn to whether the sentence was grossly disproportionate. *Simpson*, 488 S.W.3d at 323.

**1.** **The harm caused or threatened to the complainant was significant.**

Coleman argues that "[t]here was no testimony presented in the trial of this matter that any violence was involved." He contends that "[t]here was no evidence of harm of any sort. There was no evidence of violence. The only evidence that any force at all was used was from the [complainant] that [Coleman had] physically pushed her." As graphically demonstrated by the complainant's testimony, Coleman's portrayal of the offense as nonviolent is simply untrue.

During the guilt–innocence phase of trial, the complainant testified that on April 15, 2016, she got off work around 4:00 p.m. and went to her apartment complex after getting some dinner. As she went around a curve heading toward a parking spot at the apartments, she noticed that a car had followed her. When she parked, the other car backed really quickly into a parking spot behind her, and a black male

(Coleman)[25] whom she had never seen before got out of the car wearing navy blue or black sweatpants, a black hoodie, a white shirt, and a white hat.

The complainant had her hands full with food, mail, a makeup bag, and her work apron. When she turned to close a patio door to her apartment, Coleman was right there, pushed her inside, backed her up into a corner behind the door, and said, "We can do this the easy way or the hard way." She testified that she had told him to leave but that he "[j]ust kept repeating himself saying that we could do this the easy way or hard way. And [she] wasn't cooperating. So he was like, [']I guess we'll do this the hard way.[']"

When the complainant tried to yell for help, Coleman covered her mouth "really tight," and she "couldn't breathe." He told her that he was going to shoot or stab her if she would not be quiet. She did not know if he had a weapon, but she believed that he might have one and that he was strong enough to do anything with his hands. When she yelled out again, Coleman got mad and told her that if she did what he said, then he would not hurt her. The complainant testified, "I didn't think I was going to make it out alive. I was just terrified."

Coleman told the complainant to go to her bedroom and undress and then he performed oral sex on her. He then put a condom on and put his penis inside her vagina. At one point, he removed the condom from his penis and continued having

[25]As noted above, the complainant did not know Coleman and did not identify him in court until the conclusion of her direct examination. For ease of reference, we refer to Coleman by name in the complainant's description of the offense.

55

unprotected vaginal sex with the complainant. After ejaculating on her, he wiped it off with a nearby t-shirt. He then went back to performing oral sex, putting his tongue "right up [her] butt." Coleman then once again put his penis inside the complainant's vagina. During the assault, the complainant was crying and praying to God to get out alive. Before he left, Coleman told her that if she said anything, he would come back and hurt her. Evidence collected by a sexual-assault nurse examiner, buccal swabs collected from both the complainant and Coleman, and evidence obtained from the t-shirt corroborated the complainant's testimony.

The assault was devastating for the complainant. After calling 911 and being examined at the hospital, the complainant went back to her apartment with her mother and brother to obtain her things that evening, and she never returned. She also withdrew from college. Over two years later when the trial commenced, the complainant testified during the punishment phase that she was still living with her parents. She was paranoid about going anywhere by herself and was scared to go outside. The complainant told the jury that she has "had panic attacks from just being so worried that something's going to happen again" and that she is "always scared to go outside [alone]." The assault happened three days after she turned twenty, and as a result, she "[doesn't] even want it to get close to [her] birthday anymore because of that day." She has woken up in a sweat after nightmares, reliving it. She testified, "I'll never be the same person that I was."

Also, as noted previously, during the guilt–innocence phase, the trial court admitted into evidence Coleman's May 2016 police interview after his arrest. Among other things, the portions of the video that the State played for the jury showed the following:

- Coleman denied that he had any contact, including any sex, with anybody at all in Denton (on April 15, 2016);

- After the detective told Coleman that the complainant had called 911, Coleman asked the detective who the girl (the sexual-assault complainant) was and to go get the girl so she could see him; and

- Coleman wanted to know where the complainant had stayed after again confirming that she had identified him in a photo lineup.

In arguing that his sentence is grossly disproportionate, Coleman points out that there was no evidence of an actual weapon. The fact, however, that Coleman denied during his testimony having a gun or knife with him (and the complainant testified that she did not see one) does not negate the harm caused or threatened to the complainant. The complainant's testimony demonstrates that Coleman had threatened her as if he had a gun or a knife; covered her mouth, which made it hard for her to breathe; and put her in fear of imminent death—in addition to sexually assaulting her in her own home. *See Moore*, 54 S.W.3d at 542 (upholding mandatory life sentence for burglary of a habitation with the intent to commit indecency with a child and stating, in part, "The harm threatened to the victim and to society is great, violence perpetrated by an intruder in one's home"); *see also Rummel v. Estelle*, 445 U.S. 263, 275, 100 S. Ct. 1133, 1140 (1980) ("[T]he presence or absence of violence does

57

not always affect the strength of society's interest in deterring a particular crime or in punishing a particular criminal.").

## 2. Coleman's culpability was high.

As to his culpability, Coleman argues that "there was no violence and no evidence of forced entry or harm to the victim[;] there was only the testimony of the [complainant] to establish same[,] and [Coleman] testified that the encounter was consensual." In other words, Coleman asks us to adopt his innocent portrayal of the event—a portrayal that the jury rejected. The jury found that Coleman had entered the habitation with the intent to commit the offense of sexual assault. Thus, the jury determined that he possessed a high degree of culpability.

Moreover, in the guilt–innocence phase, the complainant testified that Coleman had told her during the assault that "this was the best rape he'd ever had" and that "it was really good pussy." When Coleman was done sexually assaulting her, he laid on the bed and "looked pleased with himself," according to the complainant. As previously noted, her testimony also reflected the efforts that Coleman had taken to conceal his identity. As they were getting dressed, "[h]e was really precise, making sure, like, he didn't leave anything, like he had done it before. Just making sure he didn't leave anything behind." He took the condom and wrapper and all his stuff. He wanted to take the t-shirt that he had used to wipe himself with, but she resisted by telling him that her dad had given it to her and suggested instead that she wash it. He

agreed, but he made her put it in the washer and would not leave until she started the machine.

During Coleman's interview with the Denton detective, the detective asked him how he expected this to play out if his DNA were actually found on the complainant. Coleman responded, "I see charges I guess in Denton County for sexual assault . . . ."

Additionally, the Denton detective testified during the guilt–innocence phase that after interviewing other women at the apartments, he concluded that Coleman had been in the complex for a period of time on April 15, 2016, thinking about approaching females who were out and about or passing through the complex and trying to engage them. Five such women testified during the guilt–innocence phase of the trial. One of these women testified that in the afternoon of April 15, 2016, she had gotten out of her car and was going up the stairs to her third-floor apartment when she heard someone following her. The footsteps she heard stopped after she got to the second floor; she did not hear them as she went to the third floor. When she got inside her apartment and was about to close the door, a black man wearing a black hoodie (with the hoodie over his head) and dark pants was inches in front of her in her doorway. He asked her if she had a boyfriend and if there was anyone else in the apartment. She said that her boyfriend was sleeping in the other room. He responded that that was too bad and walked away. The evidence reflects that roughly an hour after that happened, Coleman sexually assaulted the complainant.

During the punishment phase, Coleman's own attorney asked him if he had any "expressions of sorrow" for the sexual assault. He responded, "No. I didn't commit that crime. No." On cross-examination, Coleman further testified:

> Q    You told [your attorney] that you did not sexually assault [the complainant]?
>
> A    Correct.
>
> Q    You understand that these 12 folks sitting over here have decided beyond a reasonable doubt that you did?
>
> A    I do.
>
> Q    And are you looking at them and telling them that you disagree with their verdict?
>
> A    I do.
>
> Q    And are you still not taking responsibility for what you did on April the 15th, 2016?
>
> A    There's no responsibility to take. I didn't -- I didn't sexually assault [the complainant].
>
> Q    So you do not accept their verdict?
>
> A    No.

This was the last testimony that the jury heard before deliberating on punishment.

### 3.    Coleman's many other adjudicated and unadjudicated offenses demonstrated his inability to conform to established law.

For the third prong of the proportionality test, Coleman argues in a single sentence that "many of [his] offenses were misdemeanors and an extreme number of them were unadjudicated." This is neither persuasive nor accurate.

### a. Coleman had at least sixteen prior adjudicated offenses.

During the punishment phase, the State admitted evidence of Coleman's prior

adjudicated offenses, which included the following:

(1) Conspiracy to commit bank theft (felony);
(2) Failure to identify (misdemeanor) (three times);
(3) Assault (misdemeanor);
(4) Unlawful restraint (misdemeanor);
(5) Evading arrest (misdemeanor);
(6) Unlawful possession of a controlled substance, marijuana, more than four ounces (state-jail felony);
(7) Aggravated assault with a deadly weapon (second-degree felony; Coleman pleaded guilty and was placed on five years' probation with deferred adjudication; on September 23, 2016, the State filed a First Amended Motion to Proceed with an Adjudication of Guilt);
(8) Evading arrest-attempt (state-jail felony);
(9) Unauthorized use of a vehicle (state-jail felony);
(10) Possession of marijuana, less than two ounces (misdemeanor) (twice);
(11) Criminal trespass (misdemeanor) (twice);
(12) Retaliation, terroristic threat (third-degree felony, reduced to Class B misdemeanor);[26] and
(13) Attempted possession of marijuana, greater than four ounces (misdemeanor).

When Coleman sexually assaulted the complainant, he was on probation for the

aggravated-assault offense listed in (7) above. During the punishment phase,

---

[26]The indictment alleged that Coleman had

intentionally and knowingly harm[ed] and threaten[ed] to harm [that complainant] . . . by an unlawful act, to-wit: by making a veiled threat in the presence of the complainant about complainant, in retaliation for and on account of the service and status of said complainant as an informant, and a person who[m] the defendant knew intended to report the occurrence of a crime, to wit: Unlawful Restraint[.]

Coleman's attorney asked Coleman's probation officer about what had happened during that offense. She testified,

> According to the police report, Mr. Coleman and [a mother of his children] had been dating. They had broken up about a month prior to the offense. He began . . . arguing with her regarding her having ended the relationship. He began choking the victim. He dragged her into the kitchen, placed his knee on her chest and began banging her head into the ground. The victim stated that he turned up the stereo to cover up the sound of the assault. The victim stated that she lost consciousness more than once and heard Mr. Coleman state, "I think I killed her."

### b. Coleman had many unadjudicated offenses, including offenses against an elderly woman and a pregnant woman.

Coleman had many unadjudicated offenses. Coleman had pending charges for exploitation of an elderly person and credit-card abuse against an elderly person. As previously explained, in the guilt–innocence phase, the State played surveillance videos of Coleman snatching the purse from the elderly woman's shopping cart at a Tom Thumb on April 15, 2016. The jury also saw surveillance video showing Coleman's attempting to take money out of an ATM and then buying beer and cigarettes using credit cards from that stolen purse at the Valero gas station later that day. Coleman took the stand during both phases of trial and admitted to the theft-related offenses.

The ninety-year-old woman whose purse he admitted to stealing (five days after her eighty-eighth birthday) testified during the punishment phase that she had multiple credit cards, cash, her Medicare card (which had her Social Security number on it), and her brand-new driver's license in her purse. After she reported to the Tom

62

Thumb manager that her purse was missing, she "went outside and sat in [her] car and cried."

During the punishment phase, the State also called a Denton County Sheriff's deputy who had transported Coleman from the jail to the courthouse during the trial. He testified that in the course of performing his pat down of Coleman before transporting him to court for the second day of trial, he found a loose razor blade and a toothbrush inside an envelope containing paperwork that Coleman was bringing to the courthouse. The deputy explained that if the razor blade and toothbrush were bound together, they can be used as a shank—a cutting tool "that can be used to stab or cut something or someone." Those items constituted contraband that Coleman was not allowed to bring with him to court.

Coleman's probation officer also testified during the punishment phase that Coleman had violated the terms of his probation many times by, among other things, using PCP and marijuana; by failing to complete drug treatment;[27] and by having new charges brought against him for assaulting his children's mother again, fleeing from police, sexually assaulting the complainant, and credit-card abuse resulting from the Tom Thumb purse theft. She also testified that Coleman had told her that he had sold fake iPads to individuals willing to buy them.

---

[27]Coleman had been referred to the Substance Abuse Felony Punishment Facility.

63

The State also presented testimony during the punishment phase from the woman who owned the Toyota that Coleman had driven on April 15, 2016. She testified that she lived with her eighty-year-old mother in an apartment in a senior location in DeSoto, Texas. On April 14, 2016, she saw Coleman jump in her car, which was parked in front of her garage with the keys in it, and speed off as she was coming out of a garage. Her purse, wallet, keys, and phone were inside the car, as well as her and her mother's debit cards; the cards were later used without their permission. The four-month-old Toyota was in pristine condition at the time; when it was recovered, the inside had been ruined, and the exterior had been damaged.

Additionally, a female nurse testified in the punishment phase that on April 17, 2016, she had stopped her car in a bank drive-through when "a guy knocked [on] the door -- window and then opened the car door, [on her] side." She continued,

> He said, Give me some money. So I said, I don't have money. And he said then withdraw some money with [your] debit card. So I said, I can't find my debit card, so I have nothing in the car. No money. So -- and he said, What do you have? I said, I have my phone, iPhone. So he said, I'll take it. Then he kind of a few seconds pause. And then he said, Can I touch you?

The witness explained that he was pointing at her crotch. She responded, "No, no, no." She was pregnant at the time. So she begged him, "don't do it." And he didn't. He closed the door and left after taking her phone. An hour later, Coleman called her husband (who had implemented a lost-my-phone app) to sell the phone back. The

State played a video taken by the woman's husband of his interaction with Coleman when he met him to retrieve the phone.

In addition, as noted above, the complainant testified that Coleman had told her that "this was the best rape he'd ever had," implying this was not his first sexual-assault offense. The probation officer testified that Coleman had been arrested for another sexual assault in DeSoto, Texas, in 2005.

Finally, as noted previously, the jury also heard testimony from five other women who had encountered a man matching Coleman's description on April 15, 2016, at the apartments where he had sexually assaulted the complainant. When the woman whom Coleman had followed to her third-floor apartment identified him in court as the man that had approached her, he blurted out, "She lying man. Never seen that girl in my life. . . . Never did anything in my life." After making this outburst, the trial court warned Coleman outside the presence of the jury not to speak out or address the witnesses directly or indirectly or attempt to intimidate them in any manner. According to the record, Coleman repeatedly called this woman a bitch in court and mouthed things at the judge, but the record is not clear about whether he did these acts visibly in front of the jury.

4.    **There is no inference of gross disproportionality between Coleman's sentence and his crime, and thus, the trial court did not abuse its discretion by denying the motion for mistrial.**

After considering the evidence of all three factors, we hold that this is not one of those "rare" cases in which gross disproportionality can be inferred. *See Simpson*,

488 S.W.3d at 322–23. We, therefore, have no need to compare Coleman's sentence with sentences received by other offenders in Denton County or with sentences imposed on others committing first-degree burglary of a habitation in other jurisdictions. *See id.* Concluding that Coleman's sentence does not violate the United States or Texas Constitutions, we hold that the trial court did not abuse its discretion by denying Coleman's motion for new trial. *See Karrenbrock v. State*, No. 02-16-00386-CR, 2018 WL 5289352, at *6 (Tex. App.—Fort Worth Oct. 25, 2018, pet. ref'd) (mem. op., not designated for publication) (citing *State v. Herndon*, 215 S.W.3d 901, 905 n.4, 906–07 (Tex. Crim. App. 2007)). We overrule Coleman's second issue.

## VI. CONCLUSION

Having overruled both of Coleman's issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: January 16, 2020